UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY,

               Plaintiff,

v.

CITY OF FLINT,

               Defendant,

and

FLINT CITY COUNCIL,

               Intervening defendant.

Civil Case Number 17-12107
Honorable David M. Lawson

_____/

## OPINION AND ORDER GRANTING IN PART
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

> *"There are risks and costs to action. But they are far less than the long-range risks of comfortable inaction."* — John F. Kennedy

The problems that the City of Flint has encountered with operating its water system over the past several years have been grave and well-documented. *See Boler v. Earley*, 865 F.3d 391, 397 (6th Cir. 2017) (outlining the catastrophe that resulted when Flint changed water sources from the Detroit system to the Flint River, and holding that the plaintiffs' tort claims for damages caused by drinking contaminated Flint water were not preempted by the Safe Drinking Water Act (SDWA)); *Davenport v. Lockwood, Andrews & Newnam, Inc.*, 854 F.3d 905, 907 (6th Cir. 2017) (holding in "one of numerous actions arising from the water crisis in Flint, Michigan" that the local controversy exception in the Class Action Fairness Act did not apply); *Guertin v. Michigan*, No. 16-CV-12412, 2017 WL 2418007 (E.D. Mich. June 5, 2017) (putative class action tort case in which the plaintiffs,

residents of Flint, alleged that state and city defendants are legally responsible for harm that was caused when plaintiffs drank and bathed in water that was contaminated with dangerous levels of lead); *Concerned Pastors for Soc. Action v. Khouri*, 217 F. Supp. 3d 960 (E.D. Mich. 2016) (holding that state and city officials failed to meet their responsibilities prescribed by regulations enacted under the SDWA to deliver safe drinking water to Flint residents); *Concerned Pastors for Soc. Action v. Khouri*, 194 F. Supp. 3d 589, 593-96 (E.D. Mich. 2016) (describing history of the Flint water crisis and allowing suit under SDWA for remedial relief to proceed). Flint's mismanagement — either at the hands of the State of Michigan while it was in receivership or on its own — has earned it an enforcement order from the Environmental Protection Agency (EPA), a consent-judgment-like settlement mandating replacement of some of the water system's infrastructure, and multiple personal injury lawsuits. The City now finds itself in the cross-hairs of another lawsuit — this time by the Michigan Department of Environmental Quality (MDEQ) — aimed at ensuring that the municipal government takes appropriate steps now to ensure that the water system has access to a safe and reliable source of drinking water into the foreseeable future, at a cost that will not bankrupt the City. The foundation of the lawsuit is an EPA communique notifying the City over a year ago that it would need to make a decision about a long-term source of drinking water, probably before October 2017, when then-current supply contracts would expire. According to the complaint, the City — through its mayor and a member of city counsel — engaged in multilateral negotiations with various entities, resulting in an agreement in April 2017 that would achieve the health, safety, and financial goals consistent with the EPA's orders. All the participants signed the agreement, except the City of Flint. Although the City administration favors the agreement, the Flint City

Council has not voted to approve it, nor has it offered an alternative. That failure to act, coupled with the urgency of securing a long-term source of finished water, prompted this lawsuit.

Plaintiff MDEQ filed a motion for summary judgment, now pending, in which it documented the past problems of Flint's water system, the path to recovery, the EPA's mandate, the financial imperatives, the need for immediate action, and the lack of any practical alternatives. MDEQ asks for a mandatory injunction directing the City to sign the negotiated agreement. The City, through its municipal law department, agrees with the MDEQ and consents to the requested relief. However, the City Council hired its own attorney and was allowed to intervene. Its response to the summary judgment motion signals agreement, for the most part, with the facts outlined by the MDEQ. It opposes the motion however on these grounds: (1) it believes that the MDEQ's claim is not ripe; (2) it contends that the complaint does not raise a federal question and therefore this Court has no subject matter jurisdiction; (3) it contends that a court cannot order a public legislative body to approve a contract; and (4) even if a court could do so, no irreparable harm has been demonstrated to justify injunctive relief. For its part, the City of Flint insists that its city council is not a juridical entity separate and distinct from the City itself, and therefore it should not be allowed to intervene in the case.

The Court heard oral argument on September 26, 2017. The Court had appointed a mediator on August 1, 2017, and settlement talks with the parties, including representatives of the City Council, continued through the oral argument date and beyond. There has been no resolution: the City Council has not voted on the negotiated agreement, it has not proposed an alternative, and the future of Flint's fragile water system — its safety, reliability, and financial stability — is in peril. Because of the City's indecision, the Court must issue its ruling.

I.

In September 2016, the EPA, which had been monitoring the Flint water system since at least October 2015 when it received a petition for an emergency order, notified the City of Flint that it would have to make a decision soon about the long-term source of its drinking water. That notification followed the issuance of an Emergency Administrative Order (EPA Order) nine months earlier on January 21, 2016, which directed Flint and the State of Michigan to take certain steps to begin to address the crisis that resulted from ill-considered decisions and actions that occurred in April 2014, when Flint began to draw its drinking water from the Flint River. The EPA emphasized the urgency of making a decision in light of the EPA Order's requirements and the impending termination of then-existing source water contracts. To date, Flint has not entered into a long-term contract. Instead, it has made a two-year agreement, and then a series of month-to-month extensions, which, the MDEQ points out, are not financially sustainable. These facts, and the ones that follow, are uncontested.

A. Historical Background

The City of Flint has operated a public water system for over a century. *See Concerned Pastors*, 217 F. Supp. 3d at 964 (citation omitted). Since 1965, the City of Detroit, through the Detroit Water and Sewerage Department (DWSD), provided its treated or "finished" water. DWSD treated water drawn from Lake Huron and shipped it via a 72" pipeline to Flint.

In November 2011, the City of Flint was put into a state-controlled receivership. In April 2013, while still under receivership, Flint announced its intention to contract with the Karegnondi Water Authority (KWA) and eventually switch from DWSD as its water source. As part of the arrangement, KWA intended to construct a pipeline that would transport raw water from Lake Huron

-4-

to Flint, where the City would use its own plant (which apparently had been mothballed for nearly 50 years) to treat the raw water before distribution.

In light of the announcement, DWSD subsequently notified Flint that effective April 2014, it would no longer be required to provide finished water to Flint. The KWA pipeline project, however, was estimated to take several years to complete, so between April 27, 2014 and October 15, 2015, Flint drew raw water from the Flint River and treated that water at its plant before distributing it to its residents. The public works department did not add the proper treatment chemicals, however, which caused the corrosive Flint River water to damage water mains and service lines, and water contaminated by lead and copper was distributed throughout the system. During that time, serious public health risks associated with Flint's water supply were discovered.

Flint eventually decided to discontinue using the Flint River as a water source. On October 16, 2015, Flint contracted with the Great Lakes Water Authority (GLWA) — which had become the lessee of DWSD's assets — to furnish drinking water that is safe and reliable. Nonetheless, in January 2016, the EPA determined that the drinking water situation in Flint posed an imminent and substantial endangerment to public health that would continue absent preventative action. In its Emergency Administrative Order, the EPA found that Flint's public health was substantially endangered by lead contamination in drinking water that persons legitimately assumed was safe for human consumption. Because changing water sources again could exacerbate the condition, the EPA Order imposed stringent requirements on Flint if it intended to switch from GLWA to another source. One such condition was that the City must demonstrate that it has a sufficient number of qualified and trained personnel to operate its water treatment plant.

### B. Financial Impact

In the April 2013 arrangement in which Flint would switch from DWSD to KWA as its water source, Flint agreed to pay 34% of the costs associated with the new pipeline's construction. As a consequence, it is now obligated to retire approximately $85,000,000 in bonds issued to fund the pipeline, as well as a share of KWA's annual fixed costs of operating its water system. Moreover, as a result of the arrangement with KWA, Flint believed it no longer needed the 72" pipeline it had previously used to receive water. In 2014, Flint entered into an agreement with the Genesee County Drain Commission (GCDC) for the sale of the pipeline in the amount of $3,987,700.

When Flint switched back to GLWA as its water source, it incurred costs that currently run $14,100,000 per year. Flint also obtained a license from GCDC to use the 72" pipeline to receive water on a temporary basis. On October 1, 2017, Flint's licensing agreement with GCDC ran out and is subject to termination so that the pipeline may be used for other purposes by GCDC. There is no evidence that the agreement has been extended; however, GCDC has stated that it has no immediate plan to cut off water to Flint.

### C. Future Water Source Issues

When the EPA notified Flint in September 2016 that it would need to decide on a long-term water source, it pointed out that time was not on its side. Among other considerations, the EPA noted:

> A nine-mile portion of Flints' drinking water distribution system was sold to Genesee County for County distribution of KWA water, and the County currently projects that it will begin using that nine mile segment in October of 2017. Therefore, unless other arrangements are made, in October of 2017 Flint will no longer have access to finished drinking water from the Great Lakes Water Authority (GLWA), forcing a choice on an alternative source.

In November 2016, the City responded that Flint's water treatment plant would provide its long-term, primary source of water. The City informed the EPA that the plant was under renovation to treat water provided by KWA, but it was unlikely that the improvements would be constructed and tested by October 2017. In the interim, Flint intended to obtain its water supply from Genesee County.

The EPA's order was later amended in November 2016 after the City announced its latest intention to switch from obtaining finished water from GLWA to treating raw water from the KWA. In the amendment, the EPA noted that a change in source water or treatment has the potential to cause corrosion and leaching of lead if the water system and the primacy agency had not planned appropriately for the change. In order to ensure that Flint continued to provide safe and reliable drinking water to its residents, the amended order prescribed the tasks and time frames required to make a water source switch in compliance with the SDWA. Those included a requirement that the City confirm its new water source and emergency back-up water source and submit a written plan for completing the KWA pipeline connection to Flint's water treatment plant, as well as a plan that provides a preliminary evaluation for Flint's treatment of its identified new source water. The EPA also required Flint to demonstrate that necessary infrastructure upgrades and other identified improvements to its water treatment plant will be implemented and to submit a written "new source treatment plan" (NSTP) to address the City's technical, managerial, and financial capacity to operate its water system in compliance with the SDWA. The NSTP also included a mandatory "performance period" of at least three months that will allow for the demonstration of the adequacy of treatment of the new source to meet all SDWA requirements before distribution to consumers. The order required Flint to submit the NSTP by March 1, 2017, and upon approval by MDEQ, the

City would be required to implement it. Under the order, Flint is required to continue to use the GLWA source until the City has demonstrated all requirements are met and the EPA has concurred. To date, Flint has not submitted an NTSP.

On December 22, 2016, GCDC's Director of Water & Waste Services informed Michigan's Director of the Department of Natural Resources that if Flint is not ready by October 2017 to deliver treated KWA water to its residents, it must either stay with GLWA or reach a supply agreement with GCDC, subject to MDEQ and KWA approval. If Flint were to stay with GLWA, which would in turn require GCDC to stay with GLWA, the City or the State would be required to pay the cost of continuing with GCDC until completion of the KWA pipeline. GCDC estimated the cost to be over $45 million for the two-year period. The letter expressly noted that it is imperative that Flint reach an agreement "quickly" for water supply to avoid unnecessary legal problems.

It is undisputed that Flint has yet to demonstrate that it has met the EPA's conditions for switching from GLWA to KWA as a water source for its residents. For one, Flint has yet to build the connector pipeline necessary to deliver raw water from KWA to the Flint water treatment plant. For another, Flint's water treatment plant is not yet in compliance with the EPA's treatment and infrastructure requirements. MDEQ asserts, and the City does not dispute, that it will take approximately three-and-a-half years and between $58,800,000 and $67,900,000 for the plant to achieve compliancy. The necessary upgrades would not be complete until September 2020, and, after factoring in the EPA's three-month performance period, Flint would not be able to distribute water obtained from KWA until at least December 2020. Additionally, Flint has not disputed that it lacks capable and qualified personnel required by the EPA to perform compliance checks and effectively operate its treatment plant.

D.  Funding Issues

In addition to the technical, logistical, and potential health problems the EPA associated with a decision to switch water sources from Flint's current supplier, the MDEQ asserts, once again without opposition by the City, that any short-term deal to continue using water from its current supplier — which would be required if Flint's proposed switch to KWA has any vitality — presents a number of other difficulties.  First, as noted above, Flint's license to use GCDC's pipeline to receive GLWA water expired earlier this month.  GCDC has the right (although apparently not the present intention) to terminate Flint's use of the pipeline at any time.  Second, if the City maintains its current short-term contract with GLWA, it will pay approximately $14,100,000 per year for drinking water.  In addition to these payments, beginning October 1, 2017, the City became contractually obligated to pay $7,000,000 per year in bond debt associated with the cost of building the KWA pipeline and at least $1,100,000 per year for KWA administrative expenses.  Those bond debt payments are due even if Flint does not use KWA water.

If that scenario persists, MDEQ forecasts, Flint would have to increase water prices charged to its residents by over 40% in order to keep its water fund solvent.  And even if the City is able to cover its current water expenses, the water fund is projected to be depleted by June 2018 unless the City significantly improves its fee collection rate.  Under even the most optimistic estimates, insolvency is nearly certain by the first quarter of 2019.

Moreover, Flint's water distribution infrastructure is aging, with some of the water mains dating to the 1900s.  An asset management report commissioned by the MDEQ in June 2016 recommended that at least 13 miles of Flint's water mains should be replaced annually so as not to exceed their 100-year useful life.  Likewise, the valves in the system — essential to route water and

isolate leaks — are aging, some are inoperative, and many need to be replaced. The cross connections and hydrants also require substantial repairs, which are necessary to avoid backflow and the resulting system contamination. MDEQ estimates that an investment of $204,220,000 in the next five years is necessary to ensure the system is not a danger to public health. If the City devotes its water fund to improving its water treatment plant in order to use KWA water, the City will have to divert funds from improving its water distribution system.

### E. Negotiated Long-term Water Supply Agreement

In order to address the imminent crisis, a Water Interagency Coordinating Committee (Committee) was formed to find a solution that would ensure a long-term supply of water without causing the water fund to spiral into insolvency. The Committee was comprised of the Flint City Council, the Flint Receivership Transition Advisory Board (RTAB), GCDC, GLWA, KWA, and the Michigan Governor's Office. After consultation with each other and with John S. Young, a highly experienced water management consultant, the Flint city administration (through its mayor) recommended that Flint stay with GLWA as its primary source of water, use Genesee County as its back-up water source, and sign a long-term (30-year) contract memorializing that arrangement. The recommendation was announced publicly on April 18, 2017, and the Committee worked to reach a tentative agreement that addressed the proposed recommendation.

On May 19, 2017, the Committee unanimously passed a resolution to support and recommend that the Committee approve the tentative agreement. Among other terms, the agreement ensures Flint will stay with GLWA as its primary water source and will not have to switch its water source again for 30 years; it assists Flint to position itself to build a state-of-the-art, 21st century water distribution system; and it offsets the burden of the KWA pipeline debt service by the contract

credits Flint will receive based upon transfer of its raw water rights to GLWA. That arrangement, however, would require renegotiating the $85,000,000 bond debt, which in turn would necessitate preparing proposals and returning to the bond market, calling for a six-month lead time period. The agreement also accounts for the construction of a new 42" pipeline that will run parallel to the 72" pipeline owned by GCDC. Moreover, the agreement helps ensure that the water fund remains solvent without Flint necessarily raising water rates, and creates a fund to assist low-income customers in paying their water bills. Flint's annual cost for water would decrease by almost $16 million.

The tentative agreement required the approval of the Flint City Council, RTAB, GCDC, GLWA, KWA, and the State of Michigan. Mr. Young made presentations explaining the agreement to the Flint City Council (to small groups of the membership and the Council as a whole) and various community groups. The public input period expired on May 20, 2017. All parties to the agreement — except the City Council — have signed off on the various transactions it includes, and those signatures were held in escrow pending the city's approval of the agreement. Because the agreement was not executed fully by October 1, 2017, all signatures can be released to the originating party. However, none of the participants publically have expressed an intention to walk away from the agreement for now.

### F. City Council's Inaction

On May 24, 2017, the EPA sent Flint City Councilwoman Fields a letter in response to her communication sent shortly after Flint's Mayor publicly announced her recommendation that Flint stay with GLWA. Councilwoman Fields expressed concerns with the Mayor's statement to the EPA that Flint would stay with GLWA water as a primary water source. The EPA's letter noted that the

Agency interpreted the Mayor's announcement as a recommendation and that a final decision would be made in accordance with the Flint City Charter. The letter also emphasized that from a public health standpoint, the GLWA source has proven to be a safe and reliable source over a 30-year period. The EPA pointed out that there would be insufficient time before October 2017 to switch to a non-GLWA source in conformance with the EPA's order.

On June 15, 2017, MDEQ requested that the City Council take action to approve the agreement. In its letter to the Mayor and the City Council President, MDEQ noted that GLWA water is a safe and reliable source of drinking water and continued use is important to protect public health. MDEQ indicated that further delay in either approving the agreement or proposing a reasonable alternative would create an imminent or substantial endangerment to the public. MDEQ also noted that absent the approval of the Mayor's recommendation, after October 1, 2017, there would be no available pipeline to supply GLWA water to Flint. MDEQ warned that if the agreement was not approved or no reasonable alternative that complies with the EPA's order and the SDWA was proposed by June 26, 2017, MDEQ would request the state attorney general take action against the city as authorized by Michigan Compiled Laws § 325.1022.

On June 23, 2017, the state's assistant attorney general Richard Kuhl notified the City that any further delay in approving the agreement or a decision to change the water source would create an imminent and substantial endangerment to the public in violation of the EPA's order, the settlement agreement in *Concerned Pastors v. Khouri*, and the state and federal SDWA. The letter advised that each violation provides an independent basis upon which MDEQ and the state can act. The letter also informed the City Council of the state's intention to file a motion to enforce the settlement agreement in *Concerned Pastors*.

In an effort to obtain the City Council's approval of the agreement, state and Flint employees repeatedly met with city council members to discuss the agreement and alternatives. However, on June 26, 2017, following the second extended public review and comment period, the City Council neither approved the agreement nor proposed a viable alternative. Instead, the City Council approved a short-term extension of the existing GLWA contract to September 30, 2017, since the contract was set to expire in July.

On July 25, 2017, the EPA informed MDEQ's Director of Drinking Water and Municipal Assistance Division of the Agency's concern regarding the City's source water selection. The letter emphasized that the long-term provision of high-quality water to the citizens of Flint and protection of public health depends on the choices made at present time. The EPA noted its support of the Mayor's proposal to stay with GLWA, emphasizing that such an approach will allow the City to use a source Flint has become familiar with and that demonstrates greatly improved water quality.

Despite having almost a year's notice, the City Council continues to insist that it needs more time to review alternatives before approving a long-term deal. At oral argument, counsel for the City Council stated that the Council had contacted an expert, Gary Cline, to examine the records and provide it advice. Cline apparently has indicated that he could review the proposed long-term contract with GLWA and offer his opinion by October 16 this year. And perhaps Cline has agreed to begin his work before formal arrangements are made. But Council did not approve a contract for Cline until October 9, putting it more than a year behind the curve in obtaining information about the ways and means required to address the long-term, urgent needs of the Flint water system.

Against this backdrop, the MDEQ has asked the Court to order the City of Flint to take action now, because, it says, further delay will cause inevitable — and irreparable — harm to the residents of Flint.

## II.

The plaintiff has brought the present motion under Federal Rule of Civil Procedure 56. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

As noted above, the material facts in this case largely are undisputed. The City Council disagrees with the legal conclusions to be drawn from them, and interposes some justiciability defenses. Where the material facts are mostly settled, and the question before the court is purely a legal one, the summary judgment procedure is well suited for resolution of the case. *See Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir.2009).

## A. Jurisdiction

The City Council argues that this Court has no subject matter jurisdiction to address the present dispute. Subject matter jurisdiction refers to "the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original). Federal courts have "the authority to decide cases that the Constitution and Congress have empowered them to resolve." *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 474 (6th Cir. 2008).

The MDEQ contends that this case arises under the Safe Drinking Water Act, and, because the cause of action arises under that federal law, this Court has jurisdiction under 28 U.S.C. § 1331. The MDEQ points to section 300j-8(b)(1)(B), which it says contains specific language authorizing a "State" to "commence[]" a "civil action" to "require compliance with" a "requirement" of the SDWA. But the MDEQ's cut-and-paste rendition of this section does not stand up against a plain reading of the cited statute. In full, it reads:

> No civil action may be commenced . . . under subsection (a)(1) of this section respecting violation of a requirement prescribed by or under this subchapter . . . if the Administrator, the Attorney General, or the State has commenced and is diligently prosecuting a civil action in a court of the United States to require compliance with such requirement, but in any such action in a court of the United States any person may intervene as a matter of right[.]

42 U.S.C. § 300j-8(b)(1)(B). This section does not authorize anyone to bring a lawsuit; in fact, it describes a condition under which a lawsuit may *not* be brought.

The MDEQ also cites section 300g-3(b) as furnishing authority for this lawsuit. But that section authorizes the "*Administrator* [to] bring a civil action in the appropriate United States district court to require compliance" with the SDWA, a regulation, or an enforcement order. 42 U.S.C. § 300g-3(b)(1) (emphasis added). "Administrator" refers to the EPA administrator. 42 U.S.C. § 300f(7). The authorization in this section does not extend to state agencies. *See United States. v. White*, 270 F.3d 356 (6th Cir. 2001) (noting that sections 300g-3(a) and (b) "grant[] EPA Administrator authority to issue civil compliance order or commence civil action should the state with primary enforcement authority fail to commence appropriate enforcement action"); *see also United States v. Alisal Water Corp.*, 326 F. Supp. 2d 1010 (N.D. Cal. 2002); *United States v. Massachusetts Water Resources Authority*, 48 F. Supp. 2d 65 (D. Mass. 1999).

However, Congress has empowered "[t]he United States district courts . . . to enforce in an action brought under this subsection any requirement *prescribed by or under*" the SDWA. 42 U.S.C. § 300j-8(a) (emphasis added). This citizen suit provision of the SDWA authorizes "any person [to] commence a civil action . . . against . . . any . . . governmental instrumentality . . . who is alleged to be in violation of any requirement *prescribed by or under*" the SDWA. 42 U.S.C. § 300j-8(a)(1) (emphasis added). The MDEQ has not identified any section of the SDWA or a regulation enacted thereunder as having been violated by the City of Flint. Instead, it argues that Flint is in violation of one or more state statutes that were "prescribed . . . under" the SDWA.

The SDWA was enacted in 1974 "to assure that water supply systems serving the public meet minimum national standards for protection of public health." H.R. Rep. No. 93-1185, at 1 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6454, 6454. Although the EPA Administrator is charged with the duty to enforce the Act and the related regulations, Congress created a scheme of "cooperative federalism" under which states may obtain "primary enforcement responsibility for public water systems" under certain conditions. 42 U.S.C. § 300g-2(a); *see New York v. United States*, 505 U.S. 144, 167-68 (1992) (explaining that "where Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation," the former model having "been termed 'a program of cooperative federalism'") (citations omitted). A state seeking primary enforcement responsibility under the SDWA must have: "adopted drinking water regulations that are no less stringent than the national primary drinking water regulations promulgated by the Administrator"; implemented enforcement procedures and record keeping protocols consistent with the federal regulations; adopted a plan for

providing safe drinking water in the event of emergencies; and adopted a system of administrative penalties. *See* 42 U.S.C. § 300g-2(a)(1)-(6).

It is undisputed that the Administrator has approved Michigan's conforming regulations and that the state has primary responsibility to enforce the SDWA. Michigan enacted its "no less stringent" drinking water regulations in the Michigan Safe Drinking Water Act (MSDWA) in 1976. *See* Mich. Comp. Law § 325.1001 *et seq.* The MDEQ insists that the MSDWA was "*prescribed . . . under*" the federal SDWA, and therefore this Court has authority to enforce that state law under 42 U.S.C. § 300j-8(a)(1), the SDWA's citizen suit provision.

There is merit to that argument. In *Molinary v. Powell Mountain Coal Company, Inc.*, 125 F.3d 231 (4th Cir. 1997), the court addressed the identical issue in a case that arose under the Surface Mining Control and Reclamation Act of 1977 (SMCRA), and concluded that the citizen suit section of that Act "provides a federal cause of action for the recovery of damages resulting from violation of state regulations that are a part of the state's surface coal mining and reclamation regulatory program approved by the United States Secretary of the Interior pursuant to [the] . . . SMCRA." *Id.* at 232. The SMCRA's citizen suit section — which closely tracks the SDWA's parallel provision — states:

> Any person who is injured in his person or property through the violation by any operator of any rule, regulation, order, or permit *issued pursuant to* [SMCRA] may bring an action . . . in the judicial district in which the surface coal mining operation complained of is located. . . .

30 U.S.C. § 1270(f) (emphasis added). In that case, the Secretary of the Interior had filed an *amicus* brief asserting that state regulations made for the purpose of establishing the state's primary enforcement authority were enacted "pursuant to" the SMCRA. *Id.* at 235. The court, affording deference to that position, *ibid.* (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837, 842-43 (1984)), held that "once the Secretary approves a state surface coal mining and reclamation program, the rules, regulations, orders, and permits issued under that program are 'issued,' in the language of § 520(f), 'pursuant to' SMCRA." *Id.* at 236. The court noted that this interpretation is consistent with Congress's goal of establishing a uniform, nationwide program for environmental protection in mining operations. *Ibid.*

That same reasoning compels the conclusion that the MSDWA constitute "requirement[s] *prescribed . . . under*" the SDWA. 42 U.S.C. § 300j-8(a)(1). The state law, enacted in 1976 — two years after passage of the federal SDWA — contains all of the necessary provisions that Congress laid out as conditions for the state to obtain primary enforcement responsibility for its water delivery systems. The EPA Administrator found that the MSDWA and its regulations are "no less stringent" than the EPA Administrator's national standards. The point of requiring minimum standards as a condition of obtaining primary enforcement responsibility is to ensure that the safe water benchmarks are uniform nationwide and reflect the standards "*prescribed by or under*" the SDWA. Section 300j-8(a)(1), therefore, creates a federal cause of action for violations of the MSDWA.

The Flint City Council argues that the Sixth Circuit's recent decision in *Mays v. City of Flint*, 871 F.3d 437 (6th Cir. 2017), compels the opposite conclusion. The Court disagrees. The issue in *Mays* was whether MDEQ employees, who were sued in state court by Flint residents for damages resulting from the toxic conditions of Flint water after April 2014, could remove the case to federal court under the federal-officer removal provision in 28 U.S.C. § 1442(a)(1). The MDEQ officers' theory was that because the state had primary authority to enforce the SDWA , they in essence were acting under the direction of the EPA. *Id.* at 441. In rejecting that theory, the Sixth Circuit stated that the state's primary authority to enforce the federal statute did not amount to a "delegation of

legal authority" that would be necessary to invoke the removal statute. *Id.* at 445. The court noted that although the Michigan SWDA was enacted to allow the state to obtain primacy under 42 U.S.C. § 300g-2(a)(1), when enforcing that statute the MDEQ officers were enforcing state law. *Ibid.* The court never addressed directly, however, the question whether the MSDWA contains "requirement[s] prescribed by or under" the SDWA. 42 U.S.C. § 300j-8(a). But the court acknowledged that the relationship between the EPA and the MDEQ under the federal SDWA was "a model of cooperative federalism," *id.* at 447, and that the Michigan SDWA "was *designed* to mirror federal regulations," *id.* at 448 (emphasis added). All of that suggests that if the question were squarely presented, the Sixth Circuit would follow the Fourth Circuit's reasoning in *Molinary* and conclude that the MSDWA was "prescribed . . . by" the federal SDWA.

The SDWA's citizen suit provision also contains some timing requirements. *See* 42 U.S.C. § 300j-8(b)(1)(A) (requiring 60 days advance notice to the Administrator, the violator, and the state before commencing the lawsuit). No party in this case has suggested that the MDEQ did not comply with this provision, and the evidence supports a finding of compliance. The EPA, after all, was the agency that issued the warning to Flint that prompt action needed to be taken to assure a long-term source of safe drinking water in a letter sent nine months before this lawsuit was commenced. And the MDEQ repeatedly communicated in writing to the Mayor and the Flint City Council during the negotiations that led to the agreement in early May 2017, well before this case was commenced, about the urgent need to take action.

The MDEQ has based its complaint on a violation of laws that were "prescribed . . . by" the federal SDWA. The claims in the complaint, therefore, "aris[e] under the . . . laws . . . of the United States," 28 U.S.C. § 1331, and this Court has subject matter jurisdiction to adjudicate the dispute.

B. Ripeness

The City Council also argues that the claims are not ripe because there is no actual controversy, and the MDEQ's claims rest upon "speculation and contingent future events that may never occur." That argument ignores, however, the inevitable route to insolvency that the MDEQ has charted if Flint fails in the present to secure a long-term, affordable agreement for safe drinking water. And insolvency would jeopardize Flint's ability to maintain its water delivery service infrastructure and its access to a source of safe drinking water, which will put the public health at risk.

A challenge based on ripeness can implicate at least two justiciability questions: whether a "Case or Controversy" exists within the meaning of Article III of the Constitution, and whether the plaintiff has standing to pursue the claim. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). "Ripeness requires that the injury in fact be certainly impending." *Id.* at 280 (internal quotation marks and citation omitted); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). One feature of standing is that the plaintiff demonstrate "actual present harm or a significant possibility of future harm." *Id.* at 279; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding that Article III gives claimants standing to file a lawsuit in federal court if they establish injury, causation, and redressability). Those issues tend to meld together when the ripeness challenge, as here, is based on the real-versus-hypothetical nature of the threatened injury. *Thomas More Law Ctr. v. Obama*, 651 F.3d 529, 537-38 (6th Cir. 2011) *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ("Indeed if a defendant's 'ripeness arguments concern only' the 'requirement that the injury be imminent rather than conjectural or hypothetical' then 'it follows that our analysis of [the defendant's]

standing challenge applies equally and interchangeably to its ripeness challenge.'") (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir.2006)); *see also Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 81 (1978) ("To the extent that issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' our conclusion that appellees will sustain immediate injury . . . and that such injury would be redressed by the relief requested would appear to satisfy this requirement." (internal quotation marks omitted)); *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975) ("The standing question . . . bears close affinity to questions of ripeness — whether the harm asserted has matured sufficiently to warrant judicial intervention. . . .").

The MDEQ has established the following uncontested facts. Beginning this month, Flint must pay for finished water under a short-term contract with GLWA, and also pay to retire the KWA bonds and administrative expenses, for which it is receiving no water, finished or otherwise. Flint's own projections are that under the present contractual arrangements, without substantially increasing water rates and improving collection rates, its water fund will be exhausted within a year, and it will be over $8 million in debt by June 2019, and over $42 million in debt within five years. When the water fund becomes insolvent, Flint will not be able to purchase water from GLWA (or anyone else) at the current annual rate of $14.4 million, and it certainly will not be able to fund infrastructure repairs and replacements.

Flint has sold its rights to the 72-inch water transmission line that is necessary to obtain water from GLWA. It no longer has an active lease with the new owner, GCDC, to use that facility. Without access to that transmission line, it would have no way to obtain finished water from GLWA, even if it could pay for it. Construction of a new transmission facility, if Flint could afford it, would

take at least two years, and compliance with the EPA Order's requirements for changing water sources would take even longer.

The City Council's answer to these dire circumstances is troubling. It posits that GCDC will not interfere with Flint's use of the transmission line as long as there is a need, which GCDC has confirmed. But when it comes to not being able to pay for water, the City Council responds that GLWA would not dare to cut off Flint's supply of water due to a default in payment. It cites GLWA's predecessor's experience with the Highland Park, Michigan water system, in which DWSD was given the right to seek a judgment against the municipality for unpaid water bills, and chose not to engage in self-help by turning off the tap.

One point is certain. So far, GLWA has treated the City of Flint quite well, both in its agreement to supply water after the City's catastrophic decision to switch its source of water to the Flint River in April 2014, and its arms-length negotiations during the winter and spring of this year. And it may be true that GLWA would continue to act in the spirit of the public good and not abandon Flint when its water fund becomes insolvent. But Flint has offered no facts that suggest that it can sustain its present financial course, or that it has a plan to stave off the impending insolvency of its water fund. The sole solutions offered by the City Council's attorneys are based on the kindness of strangers — who may or may not blink in a game of financial chicken — and continuing to take water it cannot pay for, which amounts to conversion, a species of theft.

Based on this, the City Council argues that the injury claimed by the MDEQ — jeopardy to the public heath of Flint residents — is based on speculation and not any immediate health concern. The Court disagrees. The plaintiff has shown imminent injury — "that the threatened injury is certainly impending." *Friends of the Earth*, 528 U.S. at 190. "Imminence is a function of

probability. And probabilities can be measured by many things, including the certainty that an event will come to pass." *Thomas More Law Ctr.*, 651 F.3d at 536. The MDEQ has shown that insolvency of Flint's water fund — caused by the City Council's inaction in the face of the necessity to address the short- and long-term needs of Flint's water system — is not only probable but inevitable. The Sixth Circuit has explained that "[t]he uncertainty that the event will come to pass may be based on developments that may occur during a gap in time between the filing of a lawsuit and a threatened future injury." *Ibid.* (citing *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir.2006) ("Standing depends on the probability of harm, not its temporal proximity.")). The City Council here has not pointed to a single "development" that "may" occur between now and next September that would forestall the probable insolvency of Flint's water fund.

To say that the MDEQ's claim is not ripe amounts to little more than whistling past the graveyard.

### C. Propriety of Injunctive Relief

Turning to the merits, the MDEQ seeks a mandatory injunction requiring Flint (and its City Council) to sign on to the agreement negotiated with GLWA, KWA, GCDC, and RTAB for GLWA to supply Flint's drinking water for thirty years, which also would grant certain credits that would ease Flint's debt burden for the KWA bonds, provide for infrastructure maintenance and replacement, and ensure the solvency of the water fund. Those entities no longer are obliged to that agreement, as Flint's inaction has allowed the signature escrow agreement to lapse. However, in the negotiations that have continued with the court-appointed mediator, no party has unequivocally refused to allow that negotiated agreement to proceed.

"The Supreme Court has held that a plaintiff seeking a permanent injunction must 'satisfy a four-factor test.'" *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO–CLC v. Kelsey–Hayes Co.*, 750 F.3d 546, 559 (6th Cir. 2014) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). A "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Ibid.* (quoting *eBay*, 547 U.S. at 391) (quotation marks and alterations omitted).

The MDEQ has alleged that Flint has not complied with state law that allows the MDEQ to order a water delivery system to take measures to protect public health. It points to Michigan Compiled Laws § 325.1015, which was enacted in 1976 "under" the SDWA, as part of the procedure to give the state primary enforcement authority of the SDWA. The relevant language of that statute reads:

> When considered necessary for protection of the public health, the department shall notify a supplier of water of the need *to make changes in operations*, to provide treatment, to make structural changes in existing systems, or to add additional capacity as necessary to produce and distribute an adequate quantity of water meeting the state drinking water standards.
> . . .
> If upon inspection the [MDEQ] determines the waterworks system to be inadequate *or so operated as to not adequately protect the public health*, the department may order the supplier of water to make alterations in the waterworks system *or its method of operation* as may be required or considered advisable by the department to assure the public water supply is adequate, healthful, and in conformance with state drinking water standards. . . .

Mich. Comp. Laws § 325.1015(1), (2) (emphasis added).

In January 2016, the EPA issued its Emergency Administrative Order directing Flint to take several actions to bring its water system into compliance with the SDWA and its regulations. In September of last year, the EPA notified Flint that "[i]n the coming days," it would "need to make a choice about its long term source of drinking water." Working with the EPA, the MDEQ sent Flint a summary of its options. But the EPA reminded Flint that the EPA order contained stringent requirements that must be met if Flint intended to change its source for water. (Those requirements included submitting a written plan that "demonstrat[es] that the City has the technical, managerial and financial capacity to operate its [public water system] in compliance with the SDWA" and "that necessary infrastructure upgrades, analysis, and testing have been completed to ensure a safe transition."). The September letter contained this additional warning: "It is essential that the City move quickly to make a final water source selection because there are a number of factors, outlined below, that leave little time to ensure the necessary requirements are met."

Over a year after that letter was sent, Flint has not made that selection. As a consequence, the MDEQ has determined that Flint is not operating its waterworks system "as to . . . adequately protect the public health." Its reasons for so concluding are summarized above and are well documented. Despite the various presentations, summaries, and the several warnings, the City Council has not offered any legitimate reason for taking no action on the negotiated agreement and has not offered any alternatives. Its attorney explained at oral argument that the City Council did not have adequate information on which to base a decision. But he could not explain what the Council has done to address that information deficit. It has been reported that the City Council desires advice from an independent expert. But it did not approve a contract for its consultant until October 9, 2017, well after several deadlines had passed and agreements had expired. The failure

of leadership, in light of the past crises and manifold warnings related to the Flint water system, is breathtaking.

Yet, the City Council insists that the Court has no authority to compel it to act. Once again, the Court disagrees.

The MDEQ has demonstrated an irreparable[7] injury resulting from the failure of Flint to establish a long-term source of its drinking water — meaning a source of supply that is safe, reliable and financially sustainable. As the Court explained in an earlier case arising from the Flint water crisis, "[i]t is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap." *Concerned Pastors*, 217 F. Supp. 3d at 972. To that end, Congress has empowered "[t]he United States district courts . . . to enforce in an action brought under this subsection any requirement prescribed by or under" the SDWA. 42 U.S.C. § 300j(a). Although the Sixth Circuit has not interpreted the scope of this provision, other circuits have read analogous language in the Clean Water Act to mean that "[t]he authority to 'enforce' an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000). Rather, as "long as the district court's equitable measures are reasonably calculated to 'remedy an established wrong,' they are not an abuse of discretion." *Ibid.* (quoting *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994)).

There is no adequate remedy at law. No damages can address the health hazards that inevitably will result from the failure of the water system, either from crumbling infrastructure or financial mismanagement.

If there is a hardship to balance against this harm, it is the theoretical threat to the City Council's autonomy and its place as a policy maker in Flint's government. But as noted above, the Council has had abundant opportunities to exercise its prerogatives in choosing a long-term water source, and has failed at every turn through its inaction. The Council insists that a court-ordered choice that trenches upon the policy decisions of elected officials is unprecedented. But this Court has intervened in other cases involving the viability of water systems when necessary, to impose equitable remedies that "order[ed] structural changes regarding the [water authority] that would override the City of Detroit's Charter, its local ordinances, and some existing contracts." *United States v. City of Detroit*, No. 77-71100, 2012 WL 6553602, at *9 (E.D. Mich. Dec. 14, 2012). State laws will not stand as an obstacle to the enforcement of federal law in appropriate circumstances. *See, e.g., Missouri v. Jenkins*, 495 U.S. 33 (1990) (holding that federal courts could require school district to levy taxes in excess of limits set by state statute in order to fund a school desegregation plan).

The equitable remedies available to the Court include injunctive relief, compelling the execution of a long-term agreement, and more drastic steps that could require the appointment of a receiver. However, the remedies ought to be "narrowly tailored," and "to the extent possible, local officials should at least have the opportunity to devise their own solutions to remedy a violation of federal law." *United States v. City of Detroit*, 2012 WL 6553602, at *9.

The urgency presented by this case requires action by Flint in a very short time. The existing short-term agreements have expired, and the viability of the long-term agreement depends in part on the ability to negotiate issuance of KWA Refunding Bonds, which require lead time that already has been foreshortened by the delay in signing the negotiated agreement past September 30, 2017.

The City Council's attorney represented to the Court that the water consultant Council hired would be able to give an assessment of the negotiated agreement by October 16, 2017. Armed with that information, Council should be able to make some decision on a long-term water source, and avail itself of the dwindling "opportunity to devise [its] own solutions to remedy a violation of federal law." *Ibid.*

However, it must make a choice promptly. Therefore, the Court will order the City of Flint — its administration and its City Council — to choose by October 23, 2017 a long-term source for water that complies with the EPA Order. That may require approving the negotiated agreement — to the extent it can be resurrected — or a new agreement. Any new agreement, however, must conform to the requirements set out in the EPA Order, as amended. Such an equitable remedy properly balances hardships between the plaintiff and the intervening defendant, and well serves the public's interest in a safe, reliable, and sustained source of drinking water for Flint's residents.

### D. City Council's Status

Flint's administration has cited several reasons why the City Council should not be considered a juridical entity that is separate from the City itself. Because of the disposition of the plaintiff's motion for summary judgment, the Court does not find it necessary to address those arguments at the present time.

### III.

The Court has subject matter jurisdiction over this case. The controversy is ripe for adjudication. The plaintiff has established the requisites for a permanent injunction compelling the City of Flint to enter a long-term water supply contract, consistent with the EPA's Emergency

Administrative Order.  Neither the defendant nor the intervening defendant has offered evidence to establish a material fact dispute.  The plaintiff is entitled to a judgment as a matter of law.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment [dkt. #26] is **GRANTED IN PART**.

It is further **ORDERED** that the City of Flint, including all the appropriate branches of its government, must choose a long term source of drinking water that satisfies EPA's Emergency Administrative Order, as amended, and sign all the requisite agreements to implement that choice **on or before October 23, 2017**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   October 17, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 17, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI